**UNITED STATES of America, Plaintiff,**

v.

**Frank SCHULLO et al., Defendants.**

**No. 4–71 Cr. 155.**

United States District Court,
D. Minnesota.
Fourth Division.
June 22, 1973.

Robert G. Renner, U. S. Atty., by Thorwald H. Anderson, Asst. U. S. Atty., for plaintiff.

Ronald I. Meshbesher, Minneapolis, Minn., for defendants Schullo and Petrangello.

Robert J. Milavetz, Minneapolis, Minn., for defendant Steve Thomas.

NEVILLE, District Judge.

Defendants were tried before a jury and found guilty of violating 18 U.S.C. §

1955, the Federal anti-gambling statute. The court instructed the jury that, under that law, before any defendant could be found guilty the government must establish beyond a reasonable doubt:

1) that a gambling business was conducted in the State of Minnesota;

2) that the business violated the laws of the State of Minnesota;

3) that the business had a gross revenue of at least $2,000 in any single day;

4) that there were five or more persons who did "conduct, finance, manage, supervise, direct or own all or a part of a gambling business . . ."

The evidence was very clear that three co-defendants, not presently on trial i. e., William Wolk, Jack Capra and Myron Fishman, conducted a gambling business in the State of Minnesota in violation of state law. Wolk, Capra and Fishman pled guilty to another offense and at least two of them were in jail at the time of this trial. These three ran and operated a bookmaking business between at least the dates of February 21, 1971 and approximately June 22, 1971. There is no question but what their activities violated the laws of the State of Minnesota and in final argument counsel for Schullo and Petrangello (though not counsel for Thomas) conceded that the evidence had established the first two statutory requirements and that Schullo and Petrangello had been engaged in a gambling business in violation of Minnesota State law. Though not so admitted by Thomas' counsel, the uncontroverted evidence as to him and the others was so strong as to leave no doubt of fulfillment of requirements 1 and 2 and the court so commented to the jury.

■ Counsel for all defendants made challenges to elements 3 and 4 as to not being sustained in the evidence and affected by alleged error in the manner in which the court instructed the jury. As to element 3, a required showing of gross revenue of at least $2,000 in any single day, the government introduced transcripts of telephonic conversations with the "book" showing that on February 20th bets totaling in excess of $25,000 were placed and again on March 3rd bets in excess of $7,000 were placed. The statute provides that a gambling business must receive *gross revenue* in excess of $2,000 in any single day. Defendants' contention is that the court erred in instructing the jury in regard to total bets placed as a measure of gross revenue. It is their view, as nearly as the court has understood it, that gross revenue is an accounting concept and in effect should be analogized to the cost of goods sold in a financial statement for a normal business, *i. e.*, total revenue less the cost of purchasing and manufacturing the products sold, arriving at gross profit before any deductions for overhead, depreciation, taxes or miscellaneous expenses. The court rejected this and instructed the jury that gross revenue as used in the statute means all wagers or bets accepted, *i. e.*, the total of all bets and wagers placed including credit as well as cash transactions. Counsel contend that in operating a "book" some bets are won and collected but that some bets are lost and must be paid off. Therefore, according to defendants, the proper way to determine gross revenue is to deduct the pay offs from the total receipts, thereby arriving at the bookmaker's net figure. The court is unequivocally convinced that if Congress had intended that definition it would have phrased the statute in different terms. Gross revenue must mean total amount of bets handled, dealt with or received as distinguished from any net figure or amount from which deductions have been taken. This court patterned its instruction after the definition in United States v. Ceraso, 467 F.2d 653 at page 657 (3d Cir. 1972), where the appellate court stated:

"The legislative history indicates that Congress contemplated that the $2000 figure would refer simply to the amount wagered in any one day. Throughout the discussion of the legislation, many Congressmen relied heavily on the Report of the President's Commission on Law Enforce-

ment and Administration of Justice, The Challenge of Crime in a Free Society. The report used the term 'gross revenue' to indicate the amount that it believed was wagered during any one period in the United States. It carefully distinguished that figure from the profit it believed organized crime made on such activity. *Id.*, at 189. During the debate, Congressmen picked up this terminology, and used the term 'gross revenue' to mean the total amount bet. Most significantly, Senator Hruska, who added the provision relating to syndicated gambling to the Organized Crime Statute, stated:

> The suggested standard for determining that such an operation is of sufficient size to warrant Federal intervention is entirely reasonable and practicable. *Any bookmaking or numbers operation which does* more than $2000 in business in one day . . . must have a substantial adverse effect on the flow of moneys and goods in interstate commerce. (Emphasis in original) 115 Cong.Rec. 10736 (1969).

The concern of Congress was the amount of daily business transacted by gamblers, not the sum of their profits.

It is a severe task for the Government to obtain sufficient evidence to sustain any convictions under any definition of gross revenue. It would complicate their task enormously if they had to attempt to show the net profits from such an operation in any one day. Gambling records are obviously not public documents. The amount of profits could generally be proven only by seizure of carefully secreted files. The interpretation suggested by appellants would render the enforcement of this statute a mockery. We, therefore, conclude that there was sufficient evidence to sustain the conviction and that the verdict was not against the weight of the evidence."

This court adopted the rationale and language of *Ceraso* and believes there was no error here.

In regard to the question of the fourth requirement *i. e.*, "conduct, finance, manage, supervise, direct or own all or a part of a gambling business", the court instructed the jury as follows:

> "The words 'conduct, finance, manage, supervise, direct or own all or part of' are to be given their normal, customary meaning. If it is proven beyond a reasonable doubt that a defendant here on trial is a bookmaker himself and exchanges line or other information or places or accepts layoff bets with another bookmaker, you may consider that defendant is conducting, financing, managing, directing or owning all or part of the gambling business of the other bookmaker.

> On the other hand, if a person is merely a customer placing a bet with a bookmaker he does not fit within the definition of those words.

> So if a person is merely a customer placing a bet or bets with a bookmaker, without being a bookmaker himself, or without being an employee or agent or runner of a bookmaker, then the defendant is not a person who conducted, financed, managed, supervised, directed or owned all or part of an illegal gambling business."

The court obtained this definition from the *Ceraso* case above cited, and from a synthesis of the language found in United States v. Becker, 461 F.2d 230, 232 (2d Cir. 1972), and United States v. Harris, 460 F.2d 1041, 1049 (5th Cir. 1972). These cases trace the legislative history of the 1970 Organized Crime Control Act. *Becker* portrays Section 1955 as having been enacted *in pari materia* with Section 18 U.S.C. § 1511 which uses the same language and has explicit legislative history to support the conclusions of this court. Thus Congress' intent was to include all those who participate in the operation of a gambling business, regardless of how minor their roles, and whether they be labeled agents, runners, independent con-

tractors or the like. Only customers of the business were to be excluded. Perhaps this court's instruction did not go even that far for no reference therein was made to the term "operation".

The court recognizes that the controversy here centers mostly around the word "conduct", and perhaps the word "finance", as there was no claim by the government that the three movant-defendants now before the court were owners or that they directly managed, supervised or directed the Wold-Capra-Fishman "book."

From the evidence before the jury however reasonable minds could find beyond a reasonable doubt that the operation of a successful "bookmaking" business requires an opportunity to "lay off" bets, i. e., to obtain sort of a re-insurance. If too many people bet only one side of an athletic contest a bookmaker assumes too great a risk of loss and endeavors to find another bookmaker where he can "lay off" his excess so as to keep his bets on each side of a game or event as equal in amount as possible. Lay off betting then is a necessity for successful bookmaking operation.

The jury further could find under the evidence that it is necessary or at least very desirable that a bookmaker be continuously informed on other bookmakers' "lines" i. e., apprised of "line" information comprising point spreads and odds being used by other bookmakers. Such is necessary to prevent undue betting on another book because the odds are better. In addition, clever betters and gamblers will attempt to "middle" two bookmakers if possible. That is, they will bet both sides of the same game with different bookmakers who are using different "line" information in hopes of winning against both bookmakers if the final score is in the middle.

█ There is no question but what the jury could find beyond a reasonable doubt that all three defendants took lay-off bets from the Wolk-Capra-Fishman "book", although they, as separate bookmakers, did not directly operate that book. The jury could find that these movant-defendants did furnish and exchange "line" information up to several times on some days. Premised on the theory that these exchanges are necessary to the successful operation of book, the jury could and apparently did find that these three men were conducting and/or financing the Wolk-Capra-Fishman bookmaking business and thus comprised part of the five persons who must be involved in a gambling business to violate the statute.

█ The court recognizes that the Congressional language used is perhaps inept to some extent but the court's function is to attempt to instruct the jury so as to permit it to act upon the Congressional intent and the Congressional history set out in the three cases above. Although the Eighth Circuit has not passed upon the matter, this court reaches the conclusion from the above three circuit court cases and from studying the statute that the words "conduct" and "finance" should receive a broad definition to accomplish the purpose of the Organized Crime Act. This court is satisfied with the construction used by the three circuits in the above cases. See United States v. Harris, supra, in support of the definition that the word "conduct" means that "this section applies generally to persons who participate in the . . . conducting of an illegal gambling business." Defense counsel's argument that the strict dictionary definition of the words "conduct" and "finance" should be adopted is not well taken. Attention of the court is called to an excerpt from 13 Criminal Law Reporter 3015, quoting a proposed amendment to 18 U.S.C. § 1955, said to be recommended by the present Executive. This would insert that one is guilty of violating § 1955 if he "Receives lay off wagers or otherwise provides re-insurance in relation to persons engaged in gambling." From this springs the familiar argument that such is not presently the law; else why would such an amendment be proposed. The court rejects this. At least two of the three circuit court cases above cited

have in effect included the above as encompassed in the term "conduct" or "finance" and while the proposed amendment would of course make the issue more clear, it does not follow that such is required nor that the law is to the contrary unless amended.

■ Counsel for Steve Thomas, though joined in by other counsel, particularly challenges the order of Chief Judge Devitt of this court, made before the defendants had been arrested and prior to the time the indictment was returned, which extended the time permitted to serve the inventory required by 18 U.S.C. § 2518(8)(d). That challenge is based on the fact that extension orders were signed on May 6, 1971 extending the inventory service period to June 15, 1971 and again on June 8, 1971 extending the period to June 30, 1971, neither of which were formally filed however with the clerk of court until October 6, 1971. Counsel apparently would like to cross-examine the Chief Judge or in some way attempt to establish that the orders were signed *nunc pro tunc*. No offer of proof was made; apparently counsel just hope to discover some irregularity. In view of the decision of the Court of Appeals in this very case, United States v. Wolk, 466 F.2d 1143 (8th Cir. 1972), which held that failure to serve any inventory timely or at all did not justify dismissal of the defendants on whom no service was made but who had actual knowledge, it would seem that this allegation by defendants' counsel is without merit even if true. Further this court passed upon this identical matter in its order ruling on pretrial motions dated November 2, 1971 (unpublished).

Another attack on the entire trial proceedings again is raised by defense counsel. They reassert their claim that the electronic surveillance or wiretap interception which comprised the principal incriminatory evidence in the case, never was properly authorized by the Attorney General or the Attorney General's office in Washington, D.C. and thus all telephone conversations should have been suppressed. Counsel have requested an evidentiary hearing on this matter, stating that they would intend to subpoena the former Attorney General John N. Mitchell, former Assistant Attorney General Will Wilson and former Deputy Assistant Attorney General Henry E. Peterson or some or all of them. This court ruled on this matter once and denied a motion to suppress the wiretap evidence in an order dated August 18, 1972. On an appeal in this very case, United State v. Wolk, 466 F.2d 1143 (8th Cir. 1972), particularly at fn. 2 the Court of Appeals could be argued to have passed on this question. Long prior to trial defense counsel had requested an evidentiary hearing to inquire into the procedures which took place at the Attorney General's office under 18 U.S.C. § 2516 which requires:

"The Attorney General, or any Assistant Attorney General specifically designated by the Attorney General, may authorize an application to a Federal judge . . . for . . . an order authorizing or approving the interception of wire or oral communications . . . ."

On the eve of the opening of the trial in the above matter defense counsel renewed the motion, which this court again denied by order dated April 26, 1973. The court at that time was cited to United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), a case however where it was admitted that neither the Attorney General or Will Wilson the Assistant Attorney General had ever heard of the application for wiretap or signed any letters or documents authorizing the same. Counsel now are renewing their request, after having been found guilty by the jury, that they be allowed the evidentiary hearing. In another gambling case originating in this court United States v. Kleve et al, (J. Larson, 4–71 Cr. 154, D.Minn. May, 1973), the Court of Appeals for the Eighth Circuit had before it a very similar if not the exact same question. By its order of June 12, 1973, that court denied a motion to remand the case to the District Court for

the purpose of taking oral evidence in an effort to impugn the affidavits submitted from the Attorney General's Office by the United States Attorney. It is noted that Judge Mehrtens in a very recent case in Florida, United States v. Davis, 72–241–Cr.–JE June 4, 1973) granted a suppression motion for failure of the Attorney General's office to follow the requirements of the wiretap statute, but under factually differing circumstances than here.

■ At the original pretrial motion culminating in this court's order of August 18, 1972, the court was presented with an affidavit from John N. Mitchell which is set out in *haec verbae*:

"John N. Mitchell, being duly sworn, deposes and says:

I held the office of Attorney General of the United States from January 21, 1969, through March 1. 1972.

On February 16, 1971, I approved a request for authority to apply for an interception order in this matter and personally initialed a memorandum of that date reflecting my favorable action on the request. I have examined the original of this memorandum and certify that it bears my initials which were personally affixed by me on February 16, 1971. Attached is a copy of my personally initialed memorandum of that date reflecting my favorable action on the request.

My memorandum of approval in this case constituted a notification to the Assistant Attorney General of the Criminal Division that the discretionary action of approving the request to make application to the court for an interception order had been taken by me."

The memorandum referred to bears the initials JNM and is copied below:

Form. DJ-156
(Ed. 4-26-65)

UNITED STATES GOVERNMENT

## Memorandum

DEPARTMENT OF JUSTICE

TO : Will Wilson
Assistant Attorney General
Criminal Division

DATE: FEB 16 1971

JNM:TM:lrt

FROM : John N. Mitchell
Attorney General

SUBJECT: Interception Order Authorization

This is with regard to your recommendation that authorization be given to Robert G. Renner, United States Attorney for the State and District of Minnesota to make application for an Order of the Court under Title 18, United States Code, Section 2518, permitting the interception of wire communications for a fifteen (15) day period to and from telephone numbers 612-339-6896, 612-339-6897, and 612-339-6898, located at Room 601 Northwest Federal Building, 730 Hennepin Avenue, Minneapolis, Minnesota, in connection with the investigation into possible violations of Title 18, United States Code, Sections 1084, 1952, 1955, and 371, by William Charles Wolk, Louis Ritacco, David Bohn, Myron Robert Fishman, James A. Mancino, Joseph L. Wolk, Jack Ernest Capra, and others as yet unknown.

Pursuant to the power conferred on me by Section 2516 of Title 18, United States Code, you are hereby specially designated to exercise that power for the purpose of authorizing Robert G. Renner, United States Attorney, to make the above-described application.

[A 7802]

Counsel are aware of current "Watergate" developments in Washington and the fact that the former Attorney General has been indicted, apparently in connection with or as the result of certain campaign contribution matters. The mere fact that an indictment has been returned as reported in the public press is not of course evidence of any guilt and is not anything on which this court would feel free to act as impugning the testimony or affidavit of John N. Mitchell, at least unless and until a conviction were to follow. The indictment alone does not show an independent cause or source for impeachment of the affidavit which John N. Mitchell has furnished. Counsel has made no showing of any possible way of impugning the above affidavit, though claiming it to be hearsay. They are unable to make any showing that the affidavit is in any way false or that there is anyone who could so establish. They apparently hope to wring an admission from the witness or witnesses on the stand which would aid their cause, but have shown the court nothing which would augur for such.

It is crystal clear that if the affidavit is truthful it constitutes compliance with 18 U.S.C. § 2516. The only possible irregularity that the court can discover in the procedure is that the actual letter to the local United States Attorney Robert G. Renner ostensibly signed by Will Wilson, then Assistant Attorney General, was in fact subscribed by, and his name affixed thereto by, one Henry E. Petersen who was then Deputy Attorney General. United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), is quite clear that this is not a cognizable defect. It is definite under *Cox* that once the Attorney General himself has approved an application for electronic surveillance, further ministerial acts are unimportant. The court there stated, acting on affidavits as in the case at bar:

"Because Mr. Mitchell did approve the application, it is unimportant that Mr. Wilson's ministerial act of sending a letter of approval to Mr. Hamilton was actually signed by Mr. Peterson, and it is irrelevant that the application and order recited the authorizing officer as Mr. Wilson rather than Mr. Mitchell. *Accord,* United States v. Pisacano, 459 F.2d at 259, n. 5. *But see* United States v. Focarile, 340 F.Supp. 1033 (D.Md.1972). The requirement in 18 U.S.C. § 2518 that the authorizing officer be named was designed to insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command. That requirement should not be construed so inflexibly as to invalidate a wiretap application personally authorized by the Attorney General of the United States simply because the request recites the Assistant Attorney General as the applying officer." 462 F.2d at 1300

In view of this case this court could not hold the proceedings to be abortive on account of the claimed signature defect, and a further evidentiary hearing thereon would be of no value and could reveal nothing in this regard. The request of the defendants for an evidentiary hearing is thus denied.

Other assignments of error are without merit. The question of the constitutionality of Section 1955 has been determined by the Eighth Circuit. *See* United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), particularly cases collected in fn. 12. The wiretap procedure has been held constitutionally sufficient as to existence of probable cause. See, United States v. Kleve, 465 F.2d 187 (8th Cir. 1972). In the court's view, defendants' requested instructions which were refused were not apposite. The court perceives no prejudicial result from admission of challenged evidence nor to incidents which occurred during final argument.

A separate order denying defendants' motions has been entered.