**UNITED STATES of America, Appellee,**

v.

**Steve THOMAS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Frank SCHULLO and Anthony Petrangelo, Appellants.**

**Nos. 73–1490, 73–1544.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1974.

Decided Jan. 3, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1677.

Ronald I. Meshbesher, Minneapolis, Minn., for appellants Schullo and Petrangelo.

Robert J. Milavetz, Minneapolis, Minn., for appellant Thomas.

Thorwald H. Anderson, Jr., Asst. U. S. Atty., for appellee.

Before HEANEY and BRIGHT, Circuit Judges, and WANGELIN, District Judge.*

BRIGHT, Circuit Judge.

Appellants Steve Thomas, Frank Schullo, and Anthony Petrangelo were tried before a jury in the United States District Court for the District of Minnesota (the late Judge Philip Neville, presiding), and convicted of a single viola-

* H. KENNETH WANGELIN, District Judge, Eastern and Western Districts of Missouri, sitting by designation.

tion of 18 U.S.C. § 1955,[1] which prohibits conducting an "illegal gambling business." This appeal followed.

At trial, the Government's evidence consisted primarily of recordings of wiretapped conversations between the appellants and three co-defendants not then on trial—Messrs. Wolk, Capra, and Fishman—who admittedly conducted an illegal "bookmaking" operation in Minneapolis. Based on these telephonic communications and on the physical evidence of gambling paraphernalia found in appellants' possession, the Government painted a picture of the appellants as bookmakers who played an integral part in the conduct of the Wolk book by "laying off" bets and by exchanging "line" information with the Wolk book on sporting events.[2]

1. 18 U.S.C. § 1955 provides in relevant part:

 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

 (b) As used in this section—

 (1) "illegal gambling business" means a gambling business which—

 (i) is a violation of the law of a State or political subdivision in which it is conducted;

 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

2. For the uninitiated, a brief lexicon of gambler's terms may be useful to understanding this case. A "bookmaker," of course, is one who accepts wagers, most commonly on sporting events.

 A bettor, in addition to the total bet, pays the bookmaker ten percent, which is the bookmaker's commission, the "vigorish" or "vig" or, sometimes, "juice," in the vernacular. Ideally, a bookmaker has an equal amount wagered on both sides of each event with the result that he has a ten percent profit, less expenses, and, ideally, loses noth-

On appeal, appellants raise the following issues:

(1) The contents of the intercepted oral communications should have been suppressed because the wiretap application was signed by a Deputy Assistant Attorney General and not the Attorney General or his specially-designated Assistant Attorney General as required under 18 U.S.C. § 2516;

(2) An evidentiary hearing should have been held to examine the truth of the Attorney General's affidavit in which he asserted that he personally approved a request for authority to apply for a wiretap order by initialing a memorandum to that effect;

(3) The evidence is insufficient to establish that defendants participated in the Wolk gambling business to the ex-

ing. In truth, betting is rarely equal on both sides and bookmakers may lose money, even to the point of their businesses being destroyed.

To protect against losses, a bookmaker normally engages in "lay off" betting whereby he passes on to another bookmaker the amount of bets by which his own "book" is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa. The "lay off" bet is therefore, in effect, bookmaker's insurance or reinsurance. Bookmakers, however, can and commonly do place personal wagers with one another which are not "lay off" bets.

The "line" constitutes the "odds" or "handicaps" or "point spreads" on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team. The "line" is subject to change as a given event approaches and a bookmaker may alter the "line" on a particular event in order to try and even out the money wagered on each side.

Bookmakers may cooperate with one another by keeping their "lines" consistent in order to avoid "middling," whereby a bettor, because there are two different point spreads on a single event, may bet and win on both competing teams. Yet bookmakers also compete, and one may use a "beard," or bettor not identifying himself with his principal, to bet heavily with the other in an effort to make a "killing," particularly where "middling" is possible because of a discrepancy in the point spread.

tent required to sustain a conviction under 18 U.S.C. § 1955;

(4) The trial court erred in instructing the jury that a violation of 18 U.S.C. § 1955 is established if the Government shows that a defendant who is a bookmaker "exchanges line or other information, or places or accepts layoff bets with another bookmaker;"

(5) The trial court erred in instructing the jury that the $2,000 per day gross revenue requirement of 18 U.S.C. § 1955(b)(1)(iii) is met by counting the total amount of wagers placed in any single day; and

(6) The statute, 18 U.S.C. § 1955, as construed by the trial court: (a) is an illegal Bill of Attainder, (b) is unconstitutionally vague, (c) contravenes the first, fifth, and sixth amendments, (d) is an improper delegation of legislative power under Article I, and (e) is an illegal usurpation of power specifically reserved to the states by the tenth amendment.

■ We find it unnecessary to fully discuss appellant's contentions numbered above as (1), (2), (5), and (6). We agree with the late Judge Neville's excellent discussion and proper determination of these issues in his district court opinion. United States v. Schullo, 363 F.Supp. 246 (D.Minn.1973). As to the validity of the wiretap (issue 1), we note that United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), on which Judge Neville relied, is in accord with the Supreme Court's decision in United States v. Chavez, 416 U.S. 500, 94 S.Ct. 1849, 40 L.Ed.2d 336 (1974), which affirmatively answered the question of whether Justice Department procedures, such as those in the instant case, comply with the wiretap authorization requirements of 18 U.S.C. § 2516. We have discussed this issue extensively in United States v. Brick, 502 F.2d 219 (8th Cir. 1974). Since the initials of Attorney General Mitchell appear on the authorization for the wiretap and his af-

fidavit filed in this case recites that he "approved a request for authority to apply for an interception order in this matter," the appellants' challenge to the wiretap must be rejected as similar challenges were rejected in *Chavez* and *Brick*.

We now turn to a consideration of the sufficiency of the evidence to sustain the conviction of each of the appealing defendants. The statute, 18 U.S.C. § 1955, defines "illegal gambling business" to mean, among other things, an operation which "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business * * *." As noted, the government's case rested on transcribed logs of wiretapped conversations between each appellant and the Wolk gambling establishment and on proof that all three defendants were bookmakers.

The appellants strongly argue that the evidence is insufficient to bring them within the purview of the statute.[3] They claim that, even assuming they were laying off bets and giving line information to the Wolk organization, they were not "involved" in the "conduct" of the Wolk business. They assert that lay off bets, if actually made, constitute a form of insurance in which one bookmaker passes the risk of loss to another and that the interests of appellants, in fact, directly conflicted with the interests of the Wolk book.

As to Anthony Petrangelo, the taped telephone conversations disclose that he furnished the Wolk book with his "line" (point spreads on various sporting events) and received Wolk's lay off betting on a regular and consistent basis. In addition, the two parties discussed opportunities for Petrangelo to further lay off a particular bet to an unnamed third party bookmaker.

The evidence against Frank Schullo indicates that he frequently called the Wolk operation inquiring of Wolk's line and that he placed bets on selected ath-

---

**3.** Thomas does not specifically argue insufficiency of the evidence as a reason for reversal of his conviction, but rather adopts the argu-

ments of insufficiency of the evidence made by his co-appellants, Petrangelo and Schullo.

letic contests with Wolk on a fairly regular basis. The taped conversations indicate that some bets were lay offs although others may have been either lay offs or personal bets. In addition, the telephonic record indicates that Wolk made frequent lay off bets with Schullo based on Schullo's line.

The evidence shows that Steve Thomas functioned as an intermediary in placing Wolk's bets with an unnamed third party bookmaker. The transcribed conversations establish that Thomas complied with the requests of the Wolk book to obtain the line from the third party bookmaker on frequent occasions. If the odds were deemed favorable, Thomas placed Wolk's bets with this bookmaker. In addition, Thomas placed some of his own personal bets with this same bookmaker.

In examining the insufficiency of the evidence claims we must determine whether the activities of the appellants fall within the statutory term "illegal gambling business." Neither Congress nor the courts have precisely delineated the reach of the term "business" within the phrase "illegal gambling business." Common usage does not offer a precise standard for the word "business" since it may encompass anything from a single profit-seeking transaction to the overall activity of an entire industry. The statutory requirement that the "business" must involve "five or more persons who conduct, finance, manage, supervise, direct, or own" some portion of the business limits the definition somewhat but still leaves the term nebulous and elastic in scope. Thus, it is necessary to examine the legislative history in order to further narrow the definition.

 Section 1955 of Title 18 was enacted as part of the Organized Crime Control Act of 1970.[4] Title VIII of the Act was aimed at syndicated gambling which Congress found to have a pervasive effect upon interstate commerce. 1970 U.S.Code Cong. & Admin.News at 4028. Although Congress, with this special finding, could arguably have proscribed all illegal gambling,[5] it evidently intended by use of the term "business" to signify an organized operation or enterprise involving at least five or more persons similar to a single firm engaged in any other field of commerce. The House Judiciary Committee Report on this portion of the Crime Control Act states:

> The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, * * * [H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970), 1970 U.S. Code Cong. & Admin.News at 4029 (hereinafter "House Report").]

Similarly, the Senate Judiciary Committee Report emphasizes that the standards of § 1955(b)(1) were designed to bring the federal power to bear only against "illegal gambling activities of major proportions."

> It is anticipated that cases in which this standard can be met will ordinari-

---

4. Organized Crime Control Act of 1970, 84 Stat. 922 (codified in scattered sections of 18 U.S.C.).

5. A special congressional finding of a similar nature was used by the Court in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), as a justification for upholding Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq., dealing with "loan sharking." *See* United States v. Hunter, 478 F.2d 1019 (7th Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973); Schneider v. United States, 459 F.2d 540 (8th Cir.), cert. denied, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972).

ly involve business-type gambling operations of considerably greater magnitude than this definition would indicate, however, because it is usually possible to prove only a relatively small proportion of the total operations of a gambling enterprise. [S.Rep.No.91–617, 91st Cong., 1st Sess. 73 (1969).]

Thus, given the congressional emphasis on fairly large organized gambling operations and the exclusion of small-scale operations through the five-person minimum, it appears that Congress intended some gambling businesses to remain beyond the scope of the statute. Initially, proposed § 1955(b)(1)(ii) defined "illegal gambling business" to mean in part an operation which "involves five or more persons who *participate* in the gambling activity." (Emphasis added).[6] It was subsequently amended and the bill reported by the House Judiciary Committee contains the final language of § 1955(b)(1)(ii) ("conduct, finance, manage, supervise, direct, or own all or part"). House Report at 12–13, 1970 U.S.Code Cong. & Admin.News at 4029. The amendment was apparently the result of objections by the Committee on Federal Legislation of the New York City Bar Association. The word "participate," it was argued, could include even the customers of a gambling business, thereby bringing the federal power to bear against such small scale operations as "Mom and Pop" bookmaking businesses having two owners and three customers. House Hearings at 325–326. The final language was intended to exclude customers from the count of "five or more." House Report at 53, 1970 U.S. Code Cong. & Admin.News at 4029. *See* United States v. Riehl, 460 F.2d 454, 459 (3d Cir. 1972).

Although it is clear that Congress was concerned with large organized gambling operations, it is often difficult to determine whether a particular operation or individual is a part of a large gambling organization. In discussing this problem, Attorney General Mitchell observed:

In areas in which the criminal syndicates operate, franchises are allocated on a territorial basis to nominally independent bookmakers and numbers operators. * * * The Cosa Nostra, on its part, provides services essential to the conduct of large-scale illegal gambling—such as providing the capital needed for "*laying off*" or reinsuring bets, and arranging for protection from law enforcement agencies—and collects its share of the profits. In an area which organized crime has invaded, there are few independent gamblers. [House Hearings at 152–53 (emphasis added).]

A system of lay off betting constitutes the cement which can weld widely scattered operations into an effective gambling organization. The President's Commission on Law Enforcement and Administration of Justice states:

Organization is also necessary to prevent severe losses. More money may be bet on one horse or one number with a small operator than he could pay off if that horse or number should win. The operator will have to hedge by betting some money himself on that horse or that number. This so-called "layoff" betting is accomplished through a network of local, regional, and national layoff men, who take bets from gambling operations. [The Challenge of Crime in a Free Society 189 (1967).]

█ In evaluating the appellants' claims of insufficiency of the evidence, we are cognizant of the congressional intent to bring federal power to bear against gambling operations organized into a business network and not against small, independent operators. A close examination of the record, including the transcribed conversations, convinces us that the activities of each appellant were of such a nature that a jury could have found that each appellant was involved

---

**6.** Hearings on S. 30 and related proposals before Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 2d Sess., ser. 27 at 41 (1970) (hereinafter "House Hearings").

in a network of gambling operations intertwined with the Wolk business to an extent sufficient to bring them within the purview of 18 U.S.C. § 1955. The activities of both Petrangelo and Thomas played a substantial part in the conduct of the Wolk book. Petrangelo aided the Wolk operation by providing a ·regular and consistent market for Wolk's lay off betting. Thomas served as an agent for or collaborator with the .Wolk book in arranging bets under circumstances assumed to be favorable under the line offered by an unnamed third party bookmaker.

The case against Schullo discloses a somewhat loose arrangement between the Wolk organization and Schullo. Schullo made at least some lay off bets with the Wolk book on a fairly regular basis and apparently also received some lay off bets from Wolk. Although the nature of the relationship between Schullo and the Wolk book is not as clearly established by the transcribed conversations as in the case of Petrangelo and Thomas, these conversations do indicate that Schullo and the Wolk book frequently exchanged lay off bets. From this evidence, a jury could conclude that in providing a regular market for Wolk's lay off bets, Schullo assisted the Wolk operation in the balancing of its books on various athletic contests. As such, a jury could conclude that Schullo conducted or financed a part of the Wolk operation.

Since the evidence establishes that more than five persons (including the appellants) were involved in the conduct and financing of the Wolk operation, the activities of each appellant in the Wolk gambling business fall within the reach of 18 U.S.C. § 1955. *See* United States v. Brick, 502 F.2d 219 (8th Cir. 1974); United States v. Ceraso, 467 F.2d 647 (3d Cir. 1972); United States v. Harris, 460 F.2d 1041 (5th Cir.), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972).

Finally, we turn to appellants' claim of error in the instructions. Judge Neville instructed the jury in terms of the statute, adding in explanation:

Now, the words, "Conduct, finance, manage, supervise, direct or own all or part of" are to be given their normal, customary meaning. *If it is proven beyond a reasonable doubt that a defendant here on trial is a bookmaker himself, and exchanges line or other information, or places or accepts layoff bets with another bookmaker,* you may consider that defendant as conducting, financing, managing, directing or owning all or part of a gambling business of the other bookmaker.

On the other hand, if a person is merely a customer placing a bet with a bookmaker, he does not fit within the definition of these words.

So, if a person is merely a customer placing a bet or bets with a bookmaker, without being a bookmaker himself or being an employee, agent, or runner of a bookmaker, then the defendant is not a person who conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business. (Emphasis added).

The appellants focus on that part of the instruction that we have emphasized above. This portion of the instruction, standing by itself, appears to be somewhat broader in reach than the statute since isolated and casual lay off bets and an occasional exchange of line information may not be sufficient to establish that one bookmaker is conducting or financing the business of a second bookmaker. However, the court clearly stated that " 'conduct, finance, manage, supervise, direct or own all or a part of' are to be given their normal, customary meaning." Moreover, the court, in explaining the contentions of the parties to the jury, emphasized appellants' contention that their exchange of line information or lay off betting with the Wolk book did not constitute the "conducting, financing, managing, supervising, or directing" of all or part of an "illegal gambling business."

The evidence discloses a consistent rather than an isolated pattern of conduct between the Wolk-Capra-Fishman book and each appellant. Under such

circumstances and viewing the instructions as a whole, we conclude that Judge Neville did not commit any prejudicial error in instructing the jury.

Accordingly, we affirm.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent. I agree with Judge Lay's dissent in United States v. Schaefer, et al., 510 F.2d 1307 (8th Cir. 1974), with respect to the "five or more" requirement of 18 U.S.C. § 1955, and would hold that the requirement was not met here. Also, I do not believe that *Chavez* forecloses a remand for an evidentiary hearing to examine the truth of the Attorney General's affidavit.