UNITED STATES of America, Appellee,

v.

Randahl SEGAL, Appellant.

UNITED STATES of America, Appellee,

v.

Robert E. SHURSEN, Appellant.

UNITED STATES of America, Appellee,

v.

William S. SHURSEN, Appellant.

Nos. 88–5082—88–5084.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1988.
Decided Feb. 17, 1989.

Phillip Resnick, Minneapolis, Minn., for Segal.

Kevin Short, Minneapolis, Minn., for W. Shursen.

Earl P. Gray, St. Paul, Minn., for R. Shursen.

Richard E. Vosepka, Asst. U.S. Atty., AUSA, Minneapolis, Minn., for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

ARNOLD, Circuit Judge.

Randahl Segal, Robert Shursen, and William Shursen separately appeal from convictions arising out of their bookmaking activities. They were tried jointly, along with two other defendants whose appeals are not before us. Segal was convicted of conducting a gambling enterprise, in violation of 18 U.S.C. § 1955, of transmitting wagering information, in violation of 18 U.S.C. § 1084, of using a facility in interstate commerce in aid of unlawful activity, in violation of 18 U.S.C. § 1952, and of failing to file a tax return, in violation of 26 U.S.C. § 7203. He appeals from all four convictions, citing an erroneous jury charge, insufficient evidence, and assorted trial errors. The jury found Robert Shursen guilty of violating 18 U.S.C. § 1955 and 26 U.S.C. § 7203. He appeals from the

---

* The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

gambling conviction, arguing that the jury charge was incorrect and the evidence insufficient. William Shursen was convicted of violating 18 U.S.C. § 1955, and appeals on the same grounds as his brother Robert. We affirm the judgment of the District Court.[1]

### I.

This case involves the relationship among three Minneapolis/St. Paul bookmaking operations during the college and professional football season of 1986–1987: the Shursen group, run by Robert Shursen and his brother William, the McCahill group, made up of William McCahill and Jay Wolkenbrod, and the Segal group, headed by Randahl Segal. Initially, there were two separate investigations into these operations. The FBI, suspecting illegal bookmaking, put pen registers[2] on phones associated with the McCahill group in October of 1986. In December of the same year, the IRS placed traps and traces[3] on telephones connected with the Shursen group. The United States Attorney's office noticed the overlap in facts and suspects and joined the two investigations. On January 11, 1987, search warrants were executed at the residences and bookmaking offices of the defendants. In July a grand jury charged Robert and William Shursen, McCahill, Wolkenbrod, and Segal in a twelve-count indictment. These five defendants were tried jointly in a three-week trial.

At trial, the jury was shown evidence from pen-register recordings of heavy telephone traffic between the McCahill and Shursen groups right before a ball game was scheduled to begin. It was also presented with trap-and-trace evidence of frequent phone contact between the Shursen group and Segal at times corresponding to the start of football games. The jury was told that the period immediately before a game started was prime bookmaking time. An FBI agent with several years of experience investigating gambling operations explained why it is necessary for large-scale bookmakers to stay in contact before a game begins. He testified that they must exchange line information[4] in order to fine-tune the Las Vegas line to their own areas and to get wagers on both sides of a contest.[5] Tr. Vol. VIII, pp. 210–220.

Next the jury was shown evidence seized during the searches. Evidence seized at the Shursens' operation revealed that the Shursen book had a gross profit of $235,000 and accounts receivable of over $140,000. Investigators found $20,000 in cash in William Shursen's apartment, as well as betting lists and sports schedules. On one list of bettors was the name "Randy" followed by the numbers "0" and "4000." Not much bookmaking evidence was found at the McCahill operation. However, the federal agent who answered the phone while the three-hour search was being conducted received $3450 in bets, despite the fact that most callers realized the person answering the phone was not Wolkenbrod, and therefore did not place bets. Evidence seized at Segal's home included one combined betting slip which showed Segal was

1. The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota.

2. A pen register records phone numbers dialed from a given telephone.

3. A trap and trace identifies the phone numbers of incoming calls.

4. We defined "line" in *United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir.1975):

   The "line" constitutes the "odds" or "handicaps" or "point spreads" on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team.

5. The agent described to the jury how bookmakers might engage in "lay-off betting" to balance their books before a game started. For example, a bookmaker might have an excess of bets on the hometown team, and wish to dilute the risk of that team's beating the spread. Using lay-off betting, the bookmaker could pass on to another bookmaker the amount of bets by which his own "book" was unbalanced. He could bet into another book. Thus, to the extent he lost to his own customers, he would win from the other bookmaker. Lay-off betting is a bookmaker's insurance. *United States v. Thomas*, 508 F.2d at 1202 n. 2.

owed over $41,000 by his customers, $12,-000 of which had recently been paid.

The jury heard a parade of bettors testify about how the three operations were conducted. The bettors told the jury that dealing with any of the three usually involved the standard 10% "juice" or commission on losing bets. A number of these bettors were actually bookmakers themselves, dependent on the larger organizations for obtaining their line and laying off bets. *E.g.*, Tr. Vol. IV, pp. 153–54, Vol. V, pp. 185–99, Vol. VII, pp. 77–85, Vol. VIII, pp. 134–58. For example, one of Segal's customers was a bookmaker with 10 to 18 customers of his own. Tr. Vol. V, p. 187. Some of the nonbookmaking bettors amassed bets from friends and relatives before calling in to one of the organizations, arguably acting as runners for the larger group. *E.g.*, Tr. at Vol. VIII, pp. 78, 84. Large bets were common. One of Segal's customers routinely wagered on several games a weekend, betting between $500 and $2000 on each event. Tr. at Vol. V, pp. 221–22. A customer of the Shursens went from being $5000 ahead in early December to being $43,000 in debt in early January. Tr. at Vol. VIII, p. 115.

The evidence showed Segal was in Florida during part of the period charged in the indictment. There was evidence through telephone records and bettor testimony that he was taking bets while in Florida.

Though tried jointly, all defendants were separately represented, and their defenses, though similar, were not identical. Robert and William Shursen, McCahill, and Wolkenbrod admitted at trial that they were bookmakers. Segal, however, maintained that he was nothing more than a high-stakes gambler. All defendants argued that they operated distinct and independent enterprises. In support of this, they presented the jury with evidence of the differences in how the businesses were conducted. For example, the Shursens' customers called in directly to bet or get line information, using first names or nicknames to identify themselves, while McCahill's customers had to reach that operation through a beeper system. The defendants offered bettor testimony that customers of the groups believed the organizations to be unrelated. The defense also repeatedly pointed out that no wiretaps were used in the investigation, so that the contents of the many phone calls between the groups were unknown. Indeed, the defense offered an alternative explanation for the calls, telling the jury that the defendants, and their wives and girlfriends, were all good friends.

## II.

■ In order to obtain a conviction under 18 U.S.C. § 1955 the government must prove the existence of an illegal gambling business. This is defined as a gambling business which

   (i) is [in] violation of the law of a State or political subdivision in which it is conducted;

   (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

   (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2000 in any single day.

18 U.S.C. § 1955(b)(1)(i–iii). Appellants' first contentions center around the statute's requirement of five or more people.

All three appellants contend that the trial court's instruction to the jury on the five-or-more requirement did not accurately reflect how the defendants were charged in the indictment. Appellants claim they were led to believe by the indictment and the government's opening statement that the government would satisfy the five-or-more requirement by proving a single gambling business involving all of the five people indicted, the Shursens, McCahill, Wolkenbrod, and Segal. They assert that this belief guided their trial strategies: they hoped to obtain acquittals by showing the three operations were independent, since if there were three businesses of less than five people, then § 1955 would not be violated. Appellants pressed this theory at the charge conference, arguing to the Court that the jury must convict all the

defendants, finding them in a single business, or none at all. The government urged the Court to reject this view, arguing that the jury could convict any defendant it found in a combination of five or more people, and that the numerical requirement could be satisfied by joining a defendant with people not named in the indictment. The Court was concerned that under the government's interpretation the jury might convict all the defendants if it found three independent bookmaking operations of five or more people. To prevent this, the Court settled on a charge that gave each side half a loaf:

In order to find any Defendant guilty of the crime charged in count one of the indictment, you must find that at least one of the factions; Faction A, Mr. McCahill and Mr. Wolkenbrod; Faction B, Mr. William Shursen and Mr. Robert Shursen; Faction C, Mr. Randahl Segal, knowingly participated in the gambling business as defined in these instructions with at least one of the other factions and the total number of people involved, either indicted or unindicted, totalled five or more.

Tr. Vol. XI, p. 140.

We do not think the Court erred in giving the instruction quoted above. First, the indictment did not name only the five defendants, but rather charged "five or more persons including the defendants ... and other persons whose identities are known and unknown to the Grand Jury" with conducting an illegal gambling business. Indictment, No. 4–87–79, ¶ 1. Thus, the defense was on notice that the government might prove its § 1955 case using nondefendants to meet the five-or-more requirement. Second, the instruction submitted by the defendants, which would have required the government to convict all five defendants or none at all, was not a correct statement of the law. See *United States v. Quarry*, 576 F.2d 830 (10th Cir.1978). In fact, the District Court's compromise instruction placed a greater burden on the government than it would otherwise have had. Under the instruction given, the government could not have obtained a conviction if the jury found that only the Shur-

sens were bookmakers and were in business with three unnamed people. Yet, under a correct statement of the law, such an outcome would be possible.

In a variation of this argument, it is urged that, whatever might be an allowable interpretation of § 1955, the Court's instruction was error under the language of this particular indictment. The indictment is naturally read as charging all five defendants with participating in a single gambling enterprise. The jury, therefore, should not have been allowed to convict them upon a showing of more than one such enterprise. If, for example, the jury found that Faction A (to use the District Court's nomenclature) was associated with Faction B, but not with Faction C, then Factions A and B (assuming the involvement of two other, unnamed people) would be in violation of the statute, but they would not be guilty of the crime charged in this indictment, because that crime consists of an enterprise including all three factions, not merely two of them. We reject this argument. Whatever its merit in the abstract, it is deficient in the present situation. The jury convicted all five defendants. Under the instruction, it must have found that Faction A was associated with B or C, that B was associated with A or C, and that C was associated with A or B. There is no combination of these findings which results in the existence of more than one enterprise. Suppose the jury found, for example, that B was associated with C, but not with A. It must have found C associated with either A or B. If it found C associated with B, but not with A, that would put B and C in the same enterprise. But A was also convicted, which means it must have been found associated with either B or C. In either case, A is part of the single enterprise charged. If A is in an enterprise with B, and B is in an enterprise with C, then, as this case was charged and tried, A, B, and C are all in the same enterprise. The defense was that there were three separate enterprises, A, B, and C, not that there were three separate enterprises, one combining A and B, one combining B and C, and one combining A and C.

So, as a practical matter, the theoretical argument urged by defendants just won't work in this case.

### III.

■ All three appellants challenge the sufficiency of the evidence supporting their convictions under 18 U.S.C. § 1955. They stress that the government's case was based entirely on circumstantial evidence, pointing out that because there were no wiretaps in this case, the contents of the phone calls are unknown. Appellants also claim there was a paucity of evidence linking the three organizations. The appellants contend that their alternative explanations for the calls and theory of three separate organizations should have prevailed.

A conviction must be upheld if, viewing the evidence in the light most favorable to the government, there is sufficient evidence to support the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The essential elements of a charge may be proved by circumstantial as well as direct evidence. *United States v. Richmond*, 700 F.2d 1183, 1189 (8th Cir.1983). The evidentiary arguments the appellants make to us were also made to the jury. The jury chose to reject appellants' explanations and inferences, and it was within the jury's province as factfinder to do so.[6] When the government's interpretations of the evidence are accepted, there is sufficient evidence to support the verdicts.

### IV.

Randahl Segal raises the remaining arguments, contesting the sufficiency of the evidence underlying his § 1952 and § 1084 convictions, the jury's rejection of his defense for not filing with the IRS as a bookmaker, and the District Court's rulings on various evidentiary matters. We address these contentions briefly.

■ Segal's claims with respect to 18 U.S.C. § 1952, the Travel Act, and 18 U.S.C. § 1084 are similar. He contends that the government presented insufficient evidence to show a violation of these statutes, because no tapes were made of his phone calls, because he was not in the bookmaking business, and because he was in Florida for a legitimate purpose, a family vacation. All these arguments were made before the jury, and were met by evidence from the government. If the jury made its inferences and credibility choices in favor of the government, there is sufficient evidence to support these convictions. Why Segal went to Florida is irrelevant; all that matters is that while there Segal used an interstate facility, the telephone, to carry on his bookmaking operation. Though popularly known as the Travel Act because it prohibits travel in furtherance of illegal activity, § 1952 also prohibits the use of interstate facilities to further illegal activity. Indeed, in the indictment Segal was charged with violating § 1952 because he used the phone lines between Minnesota and Florida to make book, not because he traveled from Minnesota to Florida to take bets. Additionally, Segal argues that the § 1084 conviction should be overturned because the indictment did not specifically indicate which of his phone calls violated the statute, but rather charged him with violating the statute during a certain time period. He claims that he could not defend against the charge without this information. We think that Segal was adequately apprised of the offense with which he was charged. The indictment named a narrow time period, nine days, corresponding to the time Segal was in Florida, and charged Segal with a specific course of conduct, making book, during that period. An assortment of bettors testified that they had placed bets with Segal during this time. Under these circumstances, Segal was fully able to defend himself against the charge.

■ Next Segal argues that he had a good and full defense for his failure to file

---

**6.** We also point out that to satisfy the five-or-more requirement, the government did not have to show that a particular defendant knew or reasonably anticipated that five or more persons were involved in his gambling organization. *United States v. Boyd,* 566 F.2d 929, 937–38 (5th Cir.1978).

with the IRS as a bookmaker: his accountant told him it was not necessary. Reliance on expert advice can be an exonerating defense in criminal tax cases. *United States v. Meyer*, 808 F.2d 1304, 1306 (8th Cir.1987). However, to prevail the defendant must show he actually relied on expert advice and that his reliance was in good faith. This defense was offered to the jury, which rejected it. The jury's verdict is supportable when we consider that the jury may have decided Segal did not rely on the accountant's advice in good faith. The jury heard evidence that Segal was a successful and sophisticated businessman. It also was presented with testimony that bookmakers are widely aware of the tax code provisions affecting them. In any case, the jury heard evidence that Segal was informed of the requirement on January 11th when his house was searched, yet continued to accept wagers until January 25th, never alerting the IRS to his sideline profession.

Segal's final claims deal with the correctness of the District Court's evidentiary rulings. We review these for an abuse of discretion only. After a full review of the record, we do not think the Court erred in any of the rulings challenged by Segal. Only two of these arguments merit discussion.

Segal claims that two items came before the jury erroneously: an allusion to drug use made by his accountant and testimony about Segal's bookmaking partnership with Robert Shursen in 1983. With respect to the first disputed item, we point out that the accountant's vague statement about drug use did not in fact come into evidence. The accountant, a hostile witness, made the comment in response to government questioning about a prior statement he had made to the FBI. That statement referred to drug use by Shursen. The defense objected immediately, the objection was sustained, the jury was instructed to disregard the comment, and the subject did not recur. Indeed, the comment was brief and if it referred to any defendant, it referred to Robert Shursen,

not Randahl Segal. The accountant's comment did not prejudice Segal. The second disputed item came in through Shursen's former girlfriend and a fellow bookmaker. Their testimony that Segal had been a bookmaker and had been in business with Shursen is certainly relevant, especially given Segal's assertion that he was merely a high-stakes gambler, who took bets only from a few friends. The testimony was correctly admitted under Fed.R.Evid. 404(b). We do not think the possibility of prejudice or confusion outweighed its probative value, since the trial court carefully instructed the jury on the purposes for which it could consider the testimony.