UNITED STATES of America, Appellee,

v.

Edward W. GUZEK, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Dennis Michael DIETCH, Appellant.

UNITED STATES of America, Appellee,

v.

Douglas Arthur SABBY, Appellant.

UNITED STATES of America, Appellee,

v.

Roger Clarence LARSON, Appellant.

UNITED STATES of America, Appellee,

v.

William Anthony FECHT, Appellant.

Nos. 75–1234, 75–1270, 75–1281, 75–1288, 75–1361.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1975.

Decided Dec. 8, 1975.

Earl P. Gray, St. Paul, Minn., made argument for appellant, Edward W. Guzek, Jr. He also filed typewritten brief for appellant.

Aurelio P. Nardi, St. Paul, Minn., made appearance for appellant, Dennis Edward Dietch. He waived argument for appellant. Mr. Nardi filed with this Court a statement adopting appellants' briefs filed in No. 75–1288 and No. 75–1361.

Irving Shaw, St. Paul, Minn., made appearance for appellant, Douglas Arthur Sabby. He waived argument for appellant. Mr. Shaw filed a statement with this Court that no brief would be filed but that briefs of appellants filed in No. 75–1288 and No. 75–1361 would be adopted.

Wood R. Foster, Jr., Minneapolis, Minn., made argument for appellant, Roger Clarence Larson. He also filed typewritten brief for appellant.

Ray Flader, St. Paul, Minn., made argument for appellant, William Anthony Fecht. He also filed typewritten brief for appellant.

Thorwald Anderson, Asst. U. S. Atty., Minneapolis, Minn., made argument for appellee, United States, in each of the above cases. Typewritten brief was filed by counsel for appellee.

Before HEANEY, BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

The appellants, Roger C. Larson, William A. Fecht, Dennis M. Dietch, Edward M. Guzek, Jr., and Douglas A. Sabby, appeal their convictions for engaging

in illegal gambling in violation of 18 U.S.C. § 1955.[1] We affirm the convictions.

The indictment charged 16 individuals, including these five defendants, with gambling law violations between November 30, 1973, and December 12, 1973.[2] The convictions before us rest on the operations of a bookmaking business by defendants Fecht and Larson (Fecht-Larson book) at 531 Rice Street in St. Paul, Minnesota. The Government conducted authorized wiretap surveillance of four telephones utilized in the Fecht-Larson book from November 30, 1973 to December 12, 1973. The information from these wiretaps served as a basis for the indictments under 18 U.S.C. § 1955, charging these five defendants with conducting, financing, managing, supervising, directing, or owning a gambling business in violation of Minnesota law[3] which had a gross revenue in excess of $2,000 on at least one day.

Fecht and Larson conceded they were bookmakers and the evidence shows that Sabby participated in this bookmaking operation as a subagent or runner at least to the extent of accepting bets from seven people, which he relayed to the Fecht-Larson book. The Government sought to satisfy the statutory requirement of five individuals by also bringing defendants Dietch and Guzek within the ambit of § 1955. Essentially, the Government contends that Dietch and Guzek operated their own books and participated in the conducting and financing of the Fecht-Larson book by making and receiving layoff bets, exchanging line information, and cooperating by other means with the Fecht-Larson book.

On appeal, the appellants principally contend that the evidence was insufficient to support the convictions. Since only five defendants remain in the case, a reversal as to any one necessitates a reversal for all. In order to sustain the convictions, the evidence must show a sufficient connection between Dietch and the Fecht-Larson book and between Guzek and the Fecht-Larson book to justify a jury finding that they, together with Fecht, Larson, and Sabby, conducted a single gambling enterprise.

I.

The evidence discloses that Dietch operated a bookmaking business and during the period of the wiretapping bet extensively with the Fecht-Larson book on athletic events, mainly football and basketball. In addition, Dietch received line information[4] from the Fecht-Larson

---

1. This statute reads in relevant part as follows:
   (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
   (b) As used in this section—
   (1) "illegal gambling business" means a gambling business which—
   (i) is a violation of the law of a State or political subdivision in which it is conducted;
   (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
   (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
   (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

2. Five of the 16 original defendants were dismissed by the Government prior to trial. Of those remaining, Vernon Kleve and William McCahill negotiated pleas of guilty, while Frank Schullo was tried and convicted in a separate trial. Bert M. Ames, who stood trial with the five defendants now before us, was acquitted by the court prior to submitting the case to the jury, and the jury acquitted George M. Patterson and Thomas A. Sieleni.

3. Bookmaking is illegal under Minn.Stat. § 609.76.

4. We defined "line" in United States v. Thomas, 508 F.2d 1200, 1202 n. 2 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975), as follows:
   The "line" constitutes the "odds" or "handicaps" or "point spreads" on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that

book on an almost daily basis. The transcribed conversations further indicate several instances where Dietch, in betting substantial amounts with the Fecht-Larson book, in effect, transferred or layed off [5] a bet received from his own customer. On another occasion during the course of the conversation, Fecht, speaking for the Fecht-Larson book, advised Dietch to change his point spread for his customers and Fecht further instructed Dietch on how to operate his betting arrangements with customers. Dietch also looked to the Fecht-Larson book for certain printed materials that may have been appropriate for the operation of his bookmaking business.

In sum, the transcribed conversations establish a consistent and ongoing relationship between two books in which one bookmaker (Fecht-Larson book) regularly provided line information to the Dietch book and, in return, received bets from Dietch, including some layoff bets.

II.

The Government's case against Guzek indicated a lesser degree of interrelationship between Guzek and the Fecht-Larson book than between Dietch and the Fecht-Larson book. The evidence disclosed that Guzek operated his own bookmaking business and made the following wagers with the Fecht-Larson book:

1) December 5, 1973—at 5:23 p. m. Guzek placed three bets at $200 each (apparently basketball). In explanation, Guzek stated "Got a few plays."

2) December 7, 1973—at 6:20 p. m. Guzek placed two bets for $300 each on professional basketball games. In inquiring of the point spread on one game Guzek indicated "That's juicy."

3) December 8, 1973—at 5:20 p. m. Guzek bet on six teams at $300 per team (apparently basketball). That same day at 6:35 p. m. Guzek bet $1,000 on a professional hockey contest. In the conversation Fecht said "I'll guarantee ya you got one guy playin' the other side of that game."

4) December 9, 1973—at 12:20 p. m. Guzek placed a wager on a professional football game for $1,000. He asked for a better point spread on a second football game but Fecht refused this request.

Roger Larson of the Fecht-Larson book placed the following wagers with Guzek:

1) December 6, 1973—at 6:11 p. m. Larson placed three bets at $500 each on three hockey matches, and an additional bet of $200 apparently on a basketball contest. In making these bets, Larson said "You've got me out of the woodwork, here you go."

2) December 7, 1973—at 6:20 p. m. Larson bet $1,000 each on two different hockey matches.

Thus, the record shows that during the 11-day wiretap period Guzek placed wagers with the Fecht-Larson book on four different days for a total of $5,000. Roger Larson of the Fecht-Larson book placed wagers with Guzek, mainly on hockey, totaling $3,700. On December 8, 1973, in discussing Guzek's line on hockey, Larson indicated that he might have to play the hockey matches personally but his partner (Fecht) indicated that he wanted to make an evaluation, apparently of the odds in these contests.

---

team must win by a score exceeding the point spread given to the nonfavored team. The "line" is subject to change as a given event approaches and a bookmaker may alter the "line" on a particular event in order to try and even out the money wagered on each side.

5. In defining layoff betting in *United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975), we observed as follows:

To protect against losses, a bookmaker normally engages in "lay off" betting whereby he passes on to another bookmaker the amount of bets by which his own "book" is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa. The "lay off" bet is therefore, in effect, bookmaker's insurance or reinsurance.

Guzek, joined by the other appellants, strongly argues that the evidence against him does not establish a basis for the jury finding that Guzek "conducted" or "financed" part of the Fecht-Larson book within the meaning of § 1955. According to Guzek, the Government failed to show and did not even attempt to show that any of these bets were layoff rather than personal bets.

The Government's expert witness on gambling, FBI agent R. Phillip Harker, testified essentially that bookmakers make layoff bets to balance their books and that virtually all bets between bookmakers are layoff bets. At times, primarily on cross-examination, he slightly broadened his definition of layoff to include a bet "which tends to arrive at what [the bookmaker] considers a favorable balance of the betting." Mr. Harker was unable to point to any specific language in the log of Guzek's transcribed conversations suggesting that any of his bets were layoffs.

Nevertheless, aside from the conversations of actual bets, other portions of the log cast light on the relationship between Guzek and the Fecht-Larson book. Particularly significant is a conversation on December 3, relating to arrangements for Guzek to pay an existing indebtedness. In this conversation between Larson and Guzek, Larson commented on the lack of business coming from Guzek and indicated that he understood Guzek's concern that Fecht-Larson would withhold Guzek's winnings to pay the outstanding gambling debt. Larson explained that the Fecht-Larson book had made certain (financial) arrangements so that Guzek need not pay a large amount on his account except out of winnings when Guzek could take off a "nickel" ($500). Larson added:

You can get paid, now the situation is changed. You can get paid and I expect you to get paid. We just want

your action rather than sending it somewhere else and having it come through to me indirect or something, all right?

Guzek's response was "yeah."

In this conversation, Guzek explained his need to promptly collect his winnings from Fecht-Larson:

See, he wants to get rid of some stuff, so I gotta get rid of some stuff * * *. He's not too much of a gambler * * *. [I]f something happened like where we got lucky, or we got unlucky and had to collect 15 and * * * if you guys [w]anna knock it off * * * I would * * have a hell of a time explaining it.

Larson responded that the situation posed "no problem, just forget about that."[6]

With this evidentiary background, we turn to an analysis of the relevant case law to determine whether the evidence was sufficient to sustain the jury verdict against the appellants.

## III.

In *United States v. Brick,* 502 F.2d 219 (8th Cir. 1974), this court considered the relationship between a central bookmaking establishment and five bookmakers who operated as subbookmakers and received a percentage of the profits. Several of the defendant bookmakers contended they conducted five separate bookmaking businesses rather than one integrated operation. Judge Talbot Smith, writing for the court, said:

We reject defendants' further contention, in effect, that they conducted five separate bookmaking businesses each involving less than five persons. The record shows that each defendant, through his transactions with Singer, became involved in a network of gambling activity of substantial proportions. Although defendants argue

---

6. Between that conversation of December 3, and December 9, Guzek apparently turned around the account balance. The telephonic records indicate that Guzek had a plus balance of $4,285 with the Fecht-Larson book on December 9. The parties also referred to a plus balance for Guzek of $3,185 on December 10, at which time Guzek asked Larson to transfer $505 to a third party to satisfy that person's claim against Guzek.

that they are independent businessmen, it is evident that the success of their individual operations was dependent upon the success of its various related components, e. g., on their ability to pool their bets with Singer (either through lay-offs or profit sharing agreements) and to share line information through him. The degree of interdependence and interrelation thus shown negates the concept of independence urged upon us. [*Id.* at 224–25.]

In *United States v. Thomas,* 508 F.2d 1200 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975), three of the defendants had made some layoff bets with the Wolk-Capra-Fishman book on a fairly regular basis and apparently also had received some layoff bets from that book. In affirming the convictions, we said:

> [The transcribed] conversations do indicate that Schullo [one of the defendants] and the Wolk book frequently exchanged lay off bets. From this evidence, a jury could conclude that in providing a regular market for Wolk's lay off bets, Schullo assisted the Wolk operation in the balancing of its books on various athletic contests. As such, a jury could conclude that Schullo conducted or financed a part of the Wolk operation. [*Id.* at 1206.]

We emphasized that the evidence disclosed "a consistent rather than an isolated pattern of conduct between the Wolk-Capra-Fishman book and each appellant" and that "isolated and casual layoff bets and an occasional exchange of line information may not be sufficient to establish that one bookmaker is conducting or financing the business of a second bookmaker." *Id.*

Similarly, in *United States v. Schaefer,* 510 F.2d 1307 (8th Cir.), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975), the Lancaster book received line information and exchanged layoff bets with the other bookmaker-defendants. On reviewing the evidence as a whole, we said:

> [W]e are satisfied that Schaefer and Christophel, along with the other appellants, were bookmakers and were *systematically* and *continuously* involved in this gambling business. [*Id.* at 1313 (emphasis added).]

In determining whether the various defendants should be considered as conducting and financing the Lancaster book within the meaning of § 1955, we said:

> The interdependence of the various individual components, including the sharing of line information and the exchanging of profits through layoff betting, outweighs the 'independent businessmen' theory urged by appellants and satisfies us that there was one 'illegal gambling business' here for the purposes of 18 U.S.C. § 1955. [*Id.* at 1312.]

In *United States v. Bohn,* 508 F.2d 1145 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975), bookmakers who transacted business with their monitored colleague also asserted a similar independent bookmaker theory. In rejecting their claims, we noted that the wiretap transcripts revealed that defendant Bohn received line information and placed layoff bets with the monitored bookmaker. However, we overturned the conviction of appellant Sierbinski since the monitored calls disclosed no exchange of line information and no wagers of any type. We rejected the Government's contention that because Sierbinski may have placed a single bet for another party he was therefore a bookmaker and involved in the conducting or financing of the monitored bookmaker's operation within the meaning of § 1955.

As these four recent cases demonstrate, the mere placing of bets by one bookmaker with another or the mere furnishing of line information in and of itself may not be sufficient to establish the interdependence of the bookmakers so as to fuse them into one single business for the purpose of counting each of these participants toward the five per-

sons necessary to establish a violation of § 1955.

The relationships between the book-makers must be closely analyzed to ascertain whether they are truly independent or whether their relationships serve to weld them into a single gambling business, usually centering on the monitored bookmaker. As we have noted in earlier cases, the existence of layoff betting, by which the profits of the gambling enterprise are shared and the risk of loss of each is reduced, is an important factor to be considered. With this background, we turn to the contentions of independence by Dietch and Guzek.

As to Dietch, the telephone recordings show not only a constant flow of information to him relating to odds and point spreads but also advice on how he might conduct his own gambling business. These conversations, in conjunction with other conversations relating to betting were sufficient for the jury to determine that such betting was in the nature of layoffs by which Dietch transferred a substantial amount of business to the Fecht-Larson book on a regular and sustained basis. We hold that the evidence was amply sufficient to sustain the jury verdict against Dietch and to count him within the five or more persons involved in a single gambling operation.

As to Guzek, the parties amplified and clarified their relationship in the conversation of December 3rd examined above. The Fecht-Larson book would carry Guzek's debt and not demand immediate payment and in return, it wanted Guzek's "action." Thereafter, the Fecht-Larson book provided Guzek with line information and changes in the line on a daily and sometimes twice-a-day or more basis. The Fecht-Larson book also provided printed sheets useful in the book-making business to Guzek, and periodically gave him friendly advice concerning his gambling operations. Guzek

placed a number of bets with the Fecht-Larson book as we have noted above. While it is true that the Government's expert witness could point to no specific conversation between the Fecht-Larson book and Guzek which clearly disclosed layoff betting, under all of the evidence the jury was entitled to find that such layoff betting in fact occurred and that the relationship between the Fecht-Larson book and Guzek was one of interdependence and that business conducted between the two parties was based on a prior arrangement of cooperation with the Fecht-Larson book transmitting information to Guzek in return for his "action." Accordingly, we think the verdict against Guzek, too, is supported by sufficient evidence.[7]

We observe, however, that without the recorded conversation of December 3rd suggesting a general business arrangement between Fecht-Larson and Guzek, the evidence otherwise does not appear sufficient to bring Guzek within the network of the Fecht-Larson gambling operation. For when an otherwise independent bookmaker such as Guzek makes layoff bets with another bookmaker such as Fecht-Larson, the latter in effect reinsures the former's business and to that extent can be said to finance that business within § 1955. This analysis applied here may serve to connect the Fecht-Larson business to Guzek but not the converse. Here, however, the jury was entitled to believe that through prearrangement, Guzek became in effect the middleman between the customer, who initially placed the bet, and the Fecht-Larson book, which ultimately assumed its risk, thus bringing Guzek within the purview of § 1955.[8]

IV.

The appellants also claim (1) that the Government relied upon an improperly broadened definition of layoff betting in

7. We do not construe Fecht-Larson's bets with Guzek as layoffs under this record. There is some evidence indicating that Larson made some personal bets and other evidence indicates that the hockey line utilized by Guzek

was separate and independent from the line available through the Fecht-Larson book.

8. The same analysis also applies to Dietch.

obtaining the convictions, (2) that the wiretap was not properly authorized, (3) that § 1955 is unduly nebulous and elastic in scope and that its enforcement violates due process of law, and (4) that the trial court erred in its instructions to the jury. We examine these contentions separately.

### A. Definition of Layoff Betting.

■ The appellants argue that the Government's expert witness improperly defined layoff betting when he suggested that virtually all bets between bookmakers are layoff bets. While Mr. Harker's testimony on layoffs at times may have been somewhat broader than that term is normally defined, other witnesses described the purpose and effect of layoff betting in strictly conventional terms relating to a shifting of risks between bookmakers. *See* n. 5, *supra.* The questioned testimony came into evidence without objection. It was the jury's function to evaluate the expert's testimony and evidence. We find this contention lacking in merit.

### B. Wiretaps.

■ On October 20, 1973, after the Attorney General of the United States, Elliot Richardson, and Deputy Attorney General, William Ruckelshaus, resigned, Solicitor General Robert H. Bork became the Acting Attorney General. On October 23, 1973, Bork authorized the Assistant Attorney General for the Criminal Division, Henry E. Peterson, as his specially designated assistant pursuant to 18 U.S.C. § 2516(1) to authorize the Chief of the Organized Crime and Racketeering Section to apply for the wiretap in the instant case. As noted, Judge Devitt approved the application and the wiretap was installed.

Relying on 5 U.S.C. §§ 3345 and 3348,[9] the appellants attack the validity of the wiretap authorization contending that Bork could not lawfully fill the office of the Attorney General beyond 30 days. Since Peterson authorized the wiretap on Bork's authority on November 24, thirty-four days after Bork assumed office, the appellants claim that the use of the wiretap was without lawful authority. We reject this argument.

Bork served as Acting Attorney General pursuant to 28 U.S.C. § 508(b) and was not subject to the 30-day limitation of 5 U.S.C. § 3348. 28 U.S.C. § 508 provides as follows:

(a) In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General.

(b) When, by reason of absence, disability, or vacancy in office, neither the Attorney General nor the Deputy Attorney General is available to exercise the duties of the office of Attorney General, the Assistant Attorneys General and the Solicitor General, in such order of succession as the Attorney General may from time to time prescribe, shall act as Attorney General.

Pursuant to 28 U.S.C. § 508, the following regulation has been promulgated:

(a) In case of vacancy in the office of Attorney General, the Deputy Attorney General shall, pursuant to 28 U.S.C. 508, perform the functions and duties of and act as Attorney General. In case of vacancy in both the office of Attorney General and the office of Deputy Attorney General, the Solicitor General shall perform the functions and duties of and act as Attorney General. [28 C.F.R. § 0.132 (1975).]

**9.** 5 U.S.C. § 3345 provides in part as follows:
When the head of an Executive department * * * dies, resigns, or is sick or absent, his first assistant * * * shall perform the duties of the office until a successor is appointed * * *.

5 U.S.C. § 3348 provides in part as follows:
A vacancy caused by death or resignation may be filled temporarily under section 3345 * * * for not more than 30 days.

Since both the Attorney General and his Deputy left office at the same time, 28 U.S.C. § 508(b) applies. Under the regulations promulgated thereunder, Bork became Acting Attorney General. Section 508(b) contains no language limiting the term of Solicitor General as Acting Attorney General. Thus, we hold that when Bork became Acting Attorney General he succeeded to all the powers of the office of the Attorney General without circumscription by the 30-day limitation of 5 U.S.C. § 3348.[10] *See United States v. Pellicci,* 504 F.2d 1106, 1107 (1st Cir. 1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); *cf. United States v. Lucido,* 373 F.Supp. 1142, 1145 (E.D.Mich.1974); *United States v. Curreri,* 363 F.Supp. 430, 434 (D.Md.1973).

C. *Due Process Argument.*

 Appellants contend that § 1955 is so vague and ambiguous as to violate due process. This contention is without merit. We have previously upheld the constitutionality of § 1955 in the face of a similar claim. *United States v. Bohn, supra,* 508 F.2d at 1148. *Accord, United States v. Sacco,* 491 F.2d 995, 999–1003 (9th Cir. 1974); *United States v. Smaldone,* 485 F.2d 1333, 1342–43 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); *United States v. Riehl,* 460 F.2d 454, 459 (3d Cir. 1972).

D. *Instructions of the Trial Court.*

We have reviewed the instructions given by the trial court. We find them generally appropriate and as fairly stating the law, free of prejudicial error.

Accordingly, we affirm the convictions.

---

**10.** The Government brief states:

The filling of the position of the Attorney General by an Acting Attorney General for a period in excess of 30 days is far from being without precedent. There have been at least six [sic] instances since 1880 (three of them since 1964) during which the office of Attorney General has been temporarily filled for a period in excess of 30 days.

The first instance occurred in the Fall of 1881, between the resignation of Attorney General Wayne MacVeagh and the entry upon duty of Attorney General Benjamin Brewster. While the exact date of that vacancy is uncertain, the reported opinions of the Attorney General disclose that Solicitor-General Samuel Phillips acted as Attorney General from October 17, 1881 to December 24, 1881. 17 Op. A.G. 221–250 (1881).

The next extended vacancy occurred between the resignation of Attorney General Robert Jackson on July 10, 1941, and the appointment of Attorney General Francis Biddle on September 5, 1941, Register, p. 127. Previous to his appointment as Attorney General, Solicitor-General Biddle acted as the Attorney General during this interim period, 40 Op. A.G. 112–133 (1941).

Deputy Attorney General Ramsey Clark served as Acting Attorney General from October 3, 1966 until his appointment as Attorney General on March 2, 1967, *Id.,* at n. 9.

The last instance, prior to Solicitor-General Bork's succession to the office of Attorney General, arose in 1972, when Deputy Attorney General Richard Kleindienst served as Acting Attorney General on June 12, 1972, *Id.,* at pp. 127–128. [sic] [Appellee Br. at 24–25 (footnote omitted).]