UNITED STATES of America, Appellee,

v.

Richard Joseph TODARO, Appellant.

No. 499, Docket 76–1355.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1976.

Decided Feb. 24, 1977.

Ivan M. Schaeffer, Atty., Dept. of Justice, Washington, D. C. (Richard J. Arcara, U. S. Atty., for the Western District of New York, Buffalo, N. Y., Sidney M. Glazer, Atty., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Herald Price Fahringer, Buffalo, N. Y., for appellant; Paul J. Cambria, Jr., Barbara J. Davies, Buffalo, N. Y., on the brief; Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., of counsel.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

Richard Todaro appeals from a judgment entered upon a jury verdict, convicting him of violating 18 U.S.C. § 1955 (1970) (conducting an illegal gambling business) and 18 U.S.C. § 2232 (1970) (unlawful destruction of flash paper to prevent its seizure by FBI agents).[1]

Apparently in early 1972 the Government conducted a substantial surveillance operation to ferret out what it believed was a major gambling operation in the Buffalo, New York area. The focal points were the Riverside News Stand, the Kenmore News Shop and an apartment on Ontario Street, Buffalo. The principal suspects were Anthony Castellani ("Anthony"), his father, Stephen Castellani ("Stephen"), Richard Giglia (Anthony's cousin), Sam Giglia and a John Zak. Anthony and Stephen were bookmakers and their activities covered horses (racetrack), football and basketball. Richard Giglia, Sam Giglia, John Zak and others accepted bets for Anthony and Stephen at various locations.

On September 8, 1972, the five principal suspects named above, who may be called the operators of the business and who actually took the bets, pleaded guilty to informations charging them with transmitting gambling information over the telephone, in violation of 18 U.S.C. § 1084(a) (1970).[2] They all received comparatively trivial sentences and the jail terms for all were suspended.[3]

The indictment against appellant Todaro, charging him with (1) conspiracy to engage in an illegal gambling business, in violation of 18 U.S.C. § 371 (1970) (Count I); (2) conducting an illegal gambling business, in violation of 18 U.S.C. § 1955 (1970) (Count II); and (3) destruction of property which was the subject of a search warrant, in

---

1. A third count, charging conspiracy to engage in an illegal gambling business, in violation of 18 U.S.C. § 371 (1970) was dismissed by the court at the close of the evidence.

2. 18 U.S.C. § 1084(a) (1970) provides, in pertinent part, as follows:

    "Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event

or contest . . . shall be fined not more than $10,000 or imprisoned not more than two years, or both."

3. Stephen received a $2,000 fine, a suspended two-year sentence, and five years probation; Anthony, a $1,000 fine, a suspended one-year sentence, and five years probation; Richard Giglia, a $1,000 fine, a suspended one-year sentence, and five years probation; Sam Giglia, a suspended sentence and five years probation; and John Zak, just five years probation.

violation of 18 U.S.C. § 2232 (Count III), was not issued until February 6, 1973.

More than three years later, Todaro was put on trial (April 20, 1976). The record is devoid of any explanation for this hiatus. His participation in the Castellanis' bookmaking business was negligible. It consisted entirely of his furnishing, by means of nine or ten telephone calls, over some twelve days in February 1972, "line" information to the actual bookmakers with respect to a predicted point spread between various basketball teams about to enter the arena.[4]

■ The chief witnesses for the Government were the Castellanis, who, having obtained "immunity" from the Government, felt free to disclose the manner of their operations. As in Stephen's opinion he was "[o]ne of the best" line makers in the business, he more than willingly disclosed how he made up his line, *i.e.*, information gleaned from sports papers, radio announcements, handicappers, others with whom he talked and, of course, his own judgment.

The trial as presented by the Government was scarcely a trial against Todaro—rather as above mentioned, it was an exposé of the Castellanis by the Castellanis. Reading the record one would gather that they were the defendants. Inadequate proof was offered that Todaro was one who "conducts, finances, manages, supervises, directs, or owns all of part of an illegal gambling business". 18 U.S.C. § 1955(a).

Stephen, on whom the Government relied, was emphatic in establishing that Todaro was not in this category. Witness the following question and answers (App. 511):

"Q. * * * Mr. Castellani, did Richard Todaro have anything to do with your bookmaking operation whatsoever?

A. Never in his life.

Q. Did he have anything to do with your son's bookmaking operation?

A. Never in his life. I was the boss."

The Government's brief on this appeal convincingly establishes the guilt of the Castellanis and others under § 1955—but they were not on trial. Only Todaro was on trial and his role was so insignificant that even giving exaggerated importance to his participation cannot elevate him beyond that of a comparative outsider supplying one of the sources of information possibly used by the Castellanis.

"In enacting 18 U.S.C. § 1955, Congress intended to reach all individuals who made a large bookmaking operation (five or more persons with a $2000 gross on any day or of 30 days or more duration) possible." (Gov't. Br., p. 10). There was no proof that Todaro placed bets, received bets, acted as a runner, was an employee of the Castellanis or *participated* in the *operation* of their business. Even mindful of the breadth we gave to this Congressional intent in *United States v. Becker*, 461 F.2d 230 (2d Cir. 1972), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974), there was no proof adequate to place Todaro in any of the mentioned categories.[5]

An extensive review has been made of the many cases cited by the Government

---

4. The Fifth Circuit provided a "how to" summary of bookmaking operations in *United States v. Box*, 530 F.2d 1258, 1260 (5th Cir. 1976). The Court described the use of "line" information as follows:

"So that betting odds can remain even on each game, a bookmaker normally has a 'line'—on each game on which he is taking bets, one team will be favored by a certain number of points, called the 'point spread.'

In an ideal situation, a bookmaker would have bets from bettors exactly balanced on each contest, so that no matter which team 'wins' (read: beats the point spread), the

bookmaker is assured a definite percentage of the amount bet." 530 F.2d at 1261 [footnotes omitted].

5. "Thus Congress' intent was to include all those who participate in the operation of a gambling business, regardless how minor their roles and whether or not they be labelled agents, runners, independent contractors or the like, and to exclude only customers of the business." *United States v. Becker*, 461 F.2d at 232.

and Todaro alike.[6] The only conclusion, fairly to be drawn therefrom, is that each case had to be resolved on its own specific facts. The facts before us here leave us with a profound conviction that the Castellani case, in effect, was tried four years after the 1972 investigation but that the jury by that time had only one defendant to convict, namely Todaro, who by insisting upon a trial (as was his right) placed himself in a vulnerable position. Conviction, however, must be justified by some violation of some statute. Without proof of any such violation Todaro's conviction under Count II cannot stand.

■ Todaro received a sentence of three years imprisonment on Count II, and of one year on Count III. His conviction on Count III presents an entirely different situation. His conduct in setting fire to the flash paper for which the agents had a search warrant definitely brought him within the purview of 18 U.S.C. § 2232.[7]

The trial court clearly and fairly instructed the jury as to the essential factual elements to be determined by them in order to arrive at a guilty verdict. Assuming that Todaro was awakened from sleep by the sound of the FBI agents' entry, his actions in leaping from his bed and igniting flash paper were indicative of his desire to destroy to prevent seizure.

The conviction under Count II is reversed and the indictment dismissed; the conviction under Count III is affirmed.

---

**6.** Among others, *United States v. McCoy*, 539 F.2d 1050 (5th Cir. 1976) (no violation of § 1955 where defendant bookmaker merely exchanged line information with another, independent bookmaker); *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976) (no violation where defendant merely supplied line information and did not accept "layoff" bets); *United States v. Guzek*, 527 F.2d 552 (8th Cir. 1975) (violation where defendants supplied line information, accepted "layoff" bets, and provided advice on gambling operations); *United States v. Box, supra* (no violation where defendant did not supply line information and accepted occasional "lay off" bets); *United States v. Joseph*, 519 F.2d 1068 (5th Cir. 1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976) (violation where defendants were one among other sources of line information and accepted occasional "layoff" bets).

**7.** "Whoever, before, during, or after seizure of any property by any person authorized to make searches and seizures in order to prevent the seizure or securing of any goods, wares, or merchandise by such person, staves, breaks, throws overboard, destroys, or removes the same, shall be fined not more than $2,000 or imprisoned not more than one year, or both."